# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4067

_____

| | | |
|---|---|---|
| Nebraska Public Power District, a political subdivision of the State of Nebraska, | * * * * | |
| Appellee, | * * | Appeal from the United States District Court for the District |
| v. | * * | of Nebraska. |
| MidAmerican Energy Company, | * * | |
| Appellant. | * | |

_____

Submitted:  October 16, 2000

Filed:  December 12, 2000

_____

Before WOLLMAN, Chief Judge, BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

BEAM, Circuit Judge.

MidAmerican Energy Company ("MEC") appeals the district court's ruling on summary judgment that MEC contractually owes appellee Nebraska Public Power District ("NPPD") current, non-refundable payments towards the estimated decommissioning costs for a nuclear facility.  We reverse and remand.

In 1967, the parties' predecessors entered a "Power Sales Contract" ("PSC").[1] The PSC obligated NPPD to construct and manage a nuclear power facility known as the Cooper Nuclear Station ("Cooper") and obligated MEC to purchase power therefrom until 2004. The parties originally contemplated a joint venture but, fearful that MEC's ownership would hinder NPPD's ability to obtain tax-exempt financing, structured the deal such that NPPD would own Cooper while MEC would pay its share through "Monthly Power Costs."

The PSC remains in effect until 2004. It requires NPPD to inform MEC by 2003 whether it will decommission or continue operating Cooper after 2004. In Section 5, the PSC distinguishes between two scenarios. If NPPD elects to shut Cooper down in 2004, the parties must share decommissioning costs equally. MEC does not dispute this liability. However, if NPPD continues operating Cooper after 2004, the PSC terminates both MEC's continuing obligations arising from Cooper and also its right to "any refund of excess payments for power and energy theretofore purchased."

The parties agree that at some point between the time they entered into the PSC and the start of the present litigation, it became apparent that the costs of decommissioning Cooper would greatly exceed those originally anticipated. In 1988, the Nuclear Regulatory Commission adopted a final rule requiring operators of nuclear facilities to file decommissioning plans, and to pre-fund decommissioning by placing money aside in an external sinking fund. See Nuclear Regulatory Commission Final Rule, General Requirements for Decommissioning Nuclear Facilities, 53 Fed. Reg. 24018-01 (June 27, 1988); 10 C.F.R. § 50.82 (2000). Since 1984 the parties have done so. The PSC requires NPPD to submit to MEC a monthly statement reflecting the prior month's Monthly Power Costs. In 1984, NPPD added a line item for decommissioning costs to this bill. While the parties neither reached a separate agreement nor amended

---

[1]The parties agree that each stands in its predecessor's shoes. Accordingly, we discuss the PSC as imposing requirements directly on NPPD and MEC.

the PSC to address these costs, MEC paid these statements without objection. Final decommissioning costs are estimated to run as high as $600,000,000. After subtracting amounts recouped through salvage value, the parties' joint liability may reach $500,000,000. As of the commencement of this litigation, the parties had each paid in approximately $78,000,000. The parties now dispute the significance of MEC's payments.

NPPD initiated this litigation, seeking a declaratory judgment that the PSC requires MEC to make current, non-refundable payments towards estimated decommissioning costs. NPPD argues that such payments fall within the definition of Monthly Power Costs, obligating MEC to pay them. Moreover, NPPD argues that they constitute "payments for power and energy." If so, in the event of NPPD's continued operation of Cooper after 2004, the PSC cuts off MEC's right to any reimbursement. MEC counters that the PSC imposes no such obligation. It argues that estimated future decommissioning costs do not fit within the definition of Monthly Power Costs and as such are wholly outside the PSC. MEC has counterclaimed to establish its right to recover the amounts it has already paid if NPPD does continue operating Cooper after 2004. The district court found the PSC unambiguously supports NPPD's position.

On appeal, MEC argues that the district court did not have the power to hear the case, asserting that the dispute is not yet ripe. On the merits, MEC argues that the district court erred as the PSC does not require payments of estimated decomissioning costs and unambiguously exempts MEC from all decommissioning liability if NPPD continues operations after 2004. We take these issues up in turn.

## Ripeness

NPPD brought this action under 28 U.S.C. § 2201, which authorizes the federal courts to issue declaratory judgments in most cases within their jurisdiction. MEC urges us to dismiss this matter for lack of jurisdiction on ripeness grounds. The PSC requires NPPD to inform MEC no later than 2003 whether it plans to decommission or continue operating Cooper after 2004. NPPD has not yet made such an election. As MEC does not dispute its obligation to pay half of all decommissioning costs in the event NPPD does decommission Cooper in 2004, MEC argues that no actual dispute can arise between the parties until 2003.

The ripeness doctrine flows both from the Article III "cases" and "controversies" limitations and also from prudential considerations for refusing to exercise jurisdiction. Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993). Its "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967). It requires that before a federal court may address itself to a question, there must exist "'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Railway Mail Ass'n v. Corsi, 326 U.S. 88, 93 (1945)). Parties may not simply submit questions of general interest or curiosity to the federal court. See, e.g., Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 244 (1952).

While elegant-sounding in theory, judicial ripeness often proves something of a cantaloupe. "The difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test." Babbitt, 442 U.S. at 297. The Supreme Court has directed that the ripeness inquiry requires examination of both the "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Abbott Labs. 387 U.S. at 149;

-4-

Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983).

The "fitness for judicial decision" inquiry goes to a court's ability to visit an issue. In appeals from administrative regulation, the fitness prong questions finality and exhaustion. See, e.g., Lane v. USDA, 187 F.3d 793, 795 (8th Cir. 1999). More generally, however, it safeguards against judicial review of hypothetical or speculative disagreements. Babbitt, 442 U.S. at 297; State of Missouri ex rel. Missouri Highway & Transp. Comm'n v. Cuffley, 112 F.3d 1332, 1337 (8th Cir. 1997). While courts shy from settling disputes contingent in part on future possibilities, certain cases may warrant review based on their particular disposition. Shalala v. Illinois Council on Long Term Care, Inc., ___ U.S. ___, ___, 120 S. Ct. 1084, 1093 (2000). Exception may be had where an issue is largely legal in nature, Abbott Labs., 387 U.S. at 149, may be resolved without further factual development, Pacific Gas, 461 U.S. at 203, or where judicial resolution will largely settle the parties' dispute, Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 539-40 (1st Cir. 1995). See also Cuffley, 112 F.3d at 1333-34, 1337-38 (refusing to address a First Amendment challenge to the Ku Klux Klan's proposed participation in a state highway sponsorship program where the state sought judicial review prior to actually rejecting the Klan's application).

In addition to being fit for judicial resolution, an issue must be such that delayed review will result in significant harm. "Harm" includes both the traditional concept of actual damages–pecuniary or otherwise–and also the heightened uncertainty and resulting behavior modification that may result from delayed resolution. Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733-34 (1998). For example, in Pacific Gas, the Court stressed the financial impact that delayed adjudication would have on the petitioning utilities and the rate-paying public by forcing them to gamble millions of dollars on an uncertain state of law. 461 U.S. at 201-02; accord Ernst & Young, 45 F.3d at 537 ("[C]ourts should not become mired in the frequently sophistic distinction as to whether refusing declaratory relief will actually impose a hardship or merely fail

to confer a benefit."). A party need not wait for actual harm to occur. <u>South Dakota Mining Ass'n v. Lawrence County</u>, 155 F.3d 1005, 1008-09 (8th Cir. 1998). However, both the immediacy and the size of the threatened harm impact the ripeness calculus–they must be significant.

As ripeness combines the constitutional and the prudential, it is unclear whether "fitness" and "significant harm" constitute a two-part test or two independent bases for ripeness. Some circuits have held that both prongs must be satisfied in order for an issue to be ripe. <u>See, e.g.</u>, <u>Ernst & Young</u>, 45 F.3d at 535; <u>Cedars-Sinai Med. Ctr. v. Watkins</u>, 11 F.3d 1573, 1581 (Fed. Cir. 1993); <u>Western Oil & Gas Ass'n v. Sonoma County</u>, 905 F.2d 1287, 1291 (9th Cir. 1990). Other circuits have noted the dispute. <u>See, e.g.</u>, <u>Philadelphia Fed'n of Teachers v. Ridge</u>, 150 F.3d 319, 325 n.7 (3d Cir. 1998); <u>Nutritional Health Alliance v. Shalala</u>, 144 F.3d 220, 226 n.12 (2d Cir. 1998). We have not previously addressed the question.

A party seeking judicial relief must necessarily satisfy both prongs to at least a minimal degree. Judicial resolution of a legal question fit for judicial review yet portending no immediate hardship would constitute little more than a law review article. Conversely, to resolve an issue lacking factual development simply to avoid a threatened harm would be to favor expedition over just resolution. <u>See, e.g.</u>, <u>Cuffley</u>, 112 F.3d at 1337-38 (refusing to address First Amendment arguments prior to state's actually taking proposed course of action). Such is not to say that we may adjudicate only purely legal issues threatening extravagant injuries. Rather, the two prongs must play off each other. <u>Ernst & Young</u>, 45 F.3d at 535 (acknowledging that the two ripeness branches must operate on a sliding scale). In <u>Pacific Gas</u>, for example, the court held ripe a preemption challenge to a state statute that barred construction of additional nuclear facilities until development of sufficient long-term spent fuel storage. 461 U.S. at 200-02. While the challenged statute had yet to be applied, the question presented was purely legal, the nature of the challenge required no further factual development and the resulting legal uncertainty placed millions of dollars in investment

at risk. Id. Somewhere between Scylla and Charybdis lie cases appropriate to judicial resolution.

MEC argues that no actual dispute can arise between the parties until 2003, when NPPD elects whether or not to decommission Cooper. Thus the triggering event for MEC's payment or non-payment remains in the future. The question presented, however, the unambiguous meaning of the PSC, is purely legal. Even if we must venture beyond the four corners of the PSC, unlike Cuffley, all facts necessary to the resolution of this case have already been established. Additionally, judicial resolution of this matter will largely settle the parties' dispute.

The issue raised also threatens substantial hardship resulting from delayed judicial resolution. Together, the parties have collected over $150,000,000 towards an anticipated exposure of up to $500,000,000 in decommissioning costs. The insecurity caused by their contending interpretations of the PSC works a definite, tangible and significant future harm, and indeed even works a present harm on their ability to plan and to conduct business operations. Delayed judicial resolution would only increase the parties' uncertainty, and would require NPPD to gamble millions of dollars on an uncertain legal foundation. Where the uncertainty resulting from such a situation creates a sufficiently substantial financial risk, or will force parties to modify their behavior significantly, an issue may be ripe. See Pacific Gas, 461 U.S. at 200-03.

Finally, we note that "[r]ipeness is peculiarly a question of timing" and is governed by the situation at the time of review, rather than the situation at the time of the events under review. Anderson v. Green, 513 U.S. 557, 559 (1995) (quotations omitted). Here, the parties are but three years from the decommissioning decision. Were we to withhold adjudication, they would perforce return here shortly, making precisely the same arguments, with nary a scintilla of additional relevant evidence. Withholding adjudication will only work significant hardship on the parties. Balancing

the foregoing, we rule the question presented–the question of the PSC's meaning–ripe for adjudication.

## The PSC's Plain Meaning

We now turn to the merits. The district court found that the PSC unambiguously obligates MEC to make current, non-refundable payments towards estimated decommissioning costs. The district court also held that MEC has forfeited any right to recovery by failing to comply with the PSC's complaint mechanism. Accordingly, the district court awarded NPPD summary judgment. MEC asks us to reverse this ruling, and to grant its motion for summary judgment.

The parties agree that Nebraska law governs the PSC. "The initial question of whether a contract is ambiguous is a question of law to be determined by the trial court." ACTONet, Ltd. v. Allou Health & Beauty Care, 219 F.3d 836, 843 (8th Cir. 2000). We review that determination de novo. Simeone v. First Bank Nat'l Ass'n, 971 F.2d 103, 106 (8th Cir.1992).

In construing a contract, we look first to see whether it is unambiguous as a matter of law.[2] "The terms of a contract are to be accorded their plain and ordinary

_____

[2]In undertaking the initial determination of whether or not a contract is unambiguous, Nebraska authorities conflict as to the application of "rules of construction." Some say that "rules of construction" should not be applied until after a finding of ambiguity. See, e.g., Kast v. American-Amicable Life Ins. Co., 559 N.W.2d 460, 464 (Neb. 1997); Nogg Bros. Paper Co. v. Bickels, 466 N.W.2d 729, 731 (Neb. 1989). However, other authorities expressly state the opposite. See, e.g., Krzycki v. Genoa Nat'l Bank, 496 N.W.2d 916, 921-22 (Neb. 1993); Husen v. Husen, 487 N.W.2d 269, 272 (Neb. 1992); National Farmers Union Serv. Corp. v. Edwards, 369 N.W.2d 76, 79 (Neb. 1985). Some cases state or do both. In C.S.B. Co. v. Isham, 541 N.W.2d 392, 396-97 (Neb. 1996), for instance, the court stated "[a] contract written in clear and unambiguous language is not subject to interpretation or

-8-

meaning as ordinary, average, or reasonable persons would understand them." Daehnke v. Nebraska Dep't of Soc. Servs., 557 N.W.2d 17, 20 (Neb. 1996). Moreover, a contract must be interpreted to give effect to the parties' intent at the time the contract was drafted. Kast v. American-Amicable Life Ins. Co., 559 N.W.2d 460, 464 (Neb. 1997). "A contract must be construed as a whole, and if possible, effect must be given to every part thereof." C.S.B. Co. v. Isham, 541 N.W.2d 392, 397 (Neb. 1996). A party may not pick and choose those portions that favor its positions. Bedrosky v. Hiner, 430 N.W.2d 535, 539 (Neb. 1988). In reading a contract for ambiguity, the specific governs the general. Krzycki v. Genoa Nat'l Bank, 496 N.W.2d

---

construction and must be enforced according to its terms," but then applied the rule that "[a] contract must be construed as a whole, and if possible, effect must be given to every part thereof." Id. This confusion also touches our own opinions. See, e.g., Lindsay Mfg. Co. v. Hartford Accident & Indem. Co., 118 F.3d 1263, 1268 n.4 (8th Cir. 1997) ("'When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning . . . .'") (quoting Katskee v. Blue Cross/Blue Shield, 515 N.W.2d 645, 649 (Neb. 1994)).

This disjunction results from the giving of two meanings to the same term. Gauging ambiguity necessarily involves the application of some rules. For instance, English-speaking courts all follow the rule that the written page should be read from top to bottom and left to right. Similarly, Nebraska courts follow rules requiring that English words be given their plain English meaning and that a contract should be construed so as to give effect to the whole. These may all be dubbed "Rules of Construction," but are really prudential rules of language that eliminate possible sources of ambiguity. Without such rules, all language becomes ambiguous.

In addition, Nebraska follows another set of rules, also referred to as "Rules of Construction," which specifically regard the construction of an ambiguous contract. An example of such is the rule that ambiguity in an insurance contract should be construed in favor of the insured. See Kast, 559 N.W.2d at 464. These should not apply until after a contract has been deemed ambiguous. Language rules, however, are central to determining whether a contract is, "as a matter of law," unambiguous.

916, 922 (Neb. 1993). In determining whether a contract is ambiguous, under Nebraska law, a court may look to course of performance evidence. Stephens v. Radium Petroleum Co., 550 N.W.2d 39, 43 (Neb. 1996). When so read, a contract "is ambiguous if a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." Krzycki, 496 N.W.2d at 921. A court must determine the meaning of an unambiguous contract without resort to extrinsic evidence. However, "if the contract is ambiguous–that is, if it may objectively be understood in more than one sense–then extrinsic evidence is admissible." Rayman v. American Charter Fed. Sav. & Loan Ass'n, 75 F.3d 349, 354 (8th Cir. 1996). Finally, that each party asserts the PSC unambiguously supports its position does not preclude us from finding unambiguity. McCormack v. Citibank, N.A., 100 F.3d 532, 538 (8th Cir. 1996).

Applying these rules to the PSC, we conclude that on its four corners, it unambiguously makes MEC liable for decommissioning costs only in the event that NPPD ceases operating Cooper in 2004, and does not impose an obligation on MEC for current, non-refundable payments of estimated decommissioning costs. In reaching its conclusion, the district court misconstrued the plain language of the PSC and credited inappropriate evidence.

## 1.    The Four-Corners Evidence

During the contract period, the PSC obligates NPPD to invoice MEC for fifty percent of "Monthly Power Costs." Section 2(l) defines these as "all of [NPPD]'s costs resulting from the ownership, operation and maintenance of and renewals and replacements to [Cooper]." The district court found that accrued, estimated decommissioning costs fell within this definition. If "Monthly Power Costs" does include estimated decommissioning costs, MEC has an unquestioned current obligation to pay them. Moreover, the PSC would cut off any right to reimbursement in the event that NPPD elects to continue operating after 2004.

This reading, however, strains the contract language. The parties anticipated some decommissioning costs and addressed them in Section 5. Section 5(b) provides that if NPPD shuts Cooper down in 2004, it must proceed with decommissioning and liquidate all Cooper assets. It requires NPPD to invoice MEC for fifty percent of all decommissioning costs accrued each month that are not satisfied from other sources,[3] for which MEC must reimburse NPPD.[4] Section 5(a), however, provides that NPPD's continued operation of Cooper after 2004 will terminate all of MEC's rights and obligations under the PSC, including those imposed by Section 5(b).[5]

Nebraska law forbids a party to pick and choose among favorable contract clauses, but rather requires each clause to be read in light of the entire contract. Bedrosky, 430 N.W.2d at 539. Section 2(l) specifically enumerates various elements

[3]NPPD must bill MEC for fifty percent of monthly decommissioning costs "in excess of funds created pursuant to the Bond Resolution, accumulated revenues from operation of [Cooper], credits received for fuel or fuel elements remaining as a part of [Cooper] at the time of decommissioning and proceeds and credits from the sale of equipment, machinery, supplies and land associated with [Cooper] or on account of the use of such items by [NPPD] for its other activities, and which are available for payment of said costs and expenses by [NPPD]."

[4]Section 5(b) provides that "[a]s an added cost of power and energy theretofore purchased, [MEC] shall reimburse [NPPD] for fifty per cent of all [of NPPD's] costs and expenses . . . associated with decommissioning [Cooper] to the extent that funds, proceeds and credits created, accumulated or realized in connection with construction, operation and decommissioning of [Cooper] are unavailable or inadequate to pay said costs and expenses."

[5]Section 5(a) provides that if NPPD continues to operate Cooper after 2004, "all rights and obligations of [MEC] under [the PSC], including any right to take further power and energy from [Cooper] and to receive any refund of excess payments for power and energy theretofore purchased and including any obligation to pay any of the costs associated with [Cooper], including payments under paragraph (b) of this Section 5, shall terminate."

of Monthly Power Costs, yet, unlike Section 5, does not reference decommissioning. Moreover, the phrase "ownership, operation and maintenance of and renewals and replacements" in section 2(l) most naturally regards only costs associated with the running of Cooper as opposed to shutting it down.

Section 2(l) must also be read in light of Section 4(b) which requires NPPD to provide MEC with a detailed estimate of Monthly Power Costs ninety days before the start of each contract year. Section 4(c) then requires NPPD to review that estimate after six months and "in the event such estimate does not substantially correspond with actual receipts or expenditures, or if there are at any time during any Contract Year extraordinary receipts or payments of unusual costs substantially affecting the Monthly Power Costs," to provide MEC with a revised estimate. This does not support the suggestion that estimated decommissioning costs, not paid until the contract expires, constitute Monthly Power Costs because the latter cannot be compared to current receipts or expenditures. This reading similarly does not square with the language in Section 5(b) which requires NPPD to bill MEC for decommissioning payments "paid or accrued . . . during the previous Month" and requires MEC to reimburse NPPD for those payments, rather than for estimated amounts.

A contract must be construed as a whole and effect must be given to every portion thereof if possible. C.S.B., 541 N.W.2d at 397. The inclusion of decommissioning as a Monthly Power Cost largely eviscerates Section 5(a)'s release of MEC from the costs imposed in Section 5(b). The district court read Section 5(a) as merely absolving MEC from responsibility for any shortfall between the pre-collected decommissioning funds and actual decommissioning costs. This reading finds support neither in the text nor in common sense. Section 5(a) expressly releases MEC from the decommissioning costs imposed by Section 5(b), and says nothing about a shortfall. Moreover, this reading would nullify the benefit MEC allegedly bargained for. Under the district court's reading, MEC exchanged sole control over and right to Cooper and its generated energy for protection from any possible shortfall. The record,

however, established that the parties periodically update their decommissioning cost forecasts, and that those projections become increasingly accurate over time. The district court's reading permits NPPD to bill MEC for fifty percent of any upward adjustment in forecast costs as an "accrued" operating expense. Even though the parties initially underestimated decommissioning costs, permitting NPPD to bill MEC for all upward adjustments will ultimately render MEC's benefit nugatory.[6]

"'[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.'" Lamb Eng'g & Const. Co. v. NPPD, 103 F.3d 1422, 1430 (8th Cir. 1997) (quoting Rafos v. Outboard Marine Corp., 1 F.3d 707, 709 (8th Cir. 1993)). The district court's reading runs contrary to the PSC's internal scheme. Section 2(i) "Costs of Acquisition and Construction," Section 2(l) "Monthly Power Costs" and Section 5 decommissioning costs together define the three stages of Cooper's life. Each stage contains discrete funding sources and protective true-up devices to ensure that each party pays only fifty percent of each stage of Cooper's costs. Including decommissioning as a Monthly Power Cost would upset this scheme. Requiring MEC to make payments based on estimated decommissioning costs would create the risk that one party will ultimately pay more than fifty percent of decommissioning. Additionally, this would require MEC to pay one-half of

---

[6] This dispute over decommissioning costs does not come newly to the courts. One circuit has previously noted that "[o]perators of nuclear generating facilities initially believed that their spent nuclear fuel would eventually be reprocessed to extract useable fissionable material for fabrication into fresh fuel assemblies. Temporarily stored spent fuel was therefore treated as an asset by electric utilities." Towns of Concord, Norwood and Wellesley v. FERC, 729 F.2d 824, 825 (D.C. Cir. 1984). Here too the parties originally underestimated decommissioning costs, and believed they would be covered by salvage values. This history squares with the Section 5 language, which requires decommissioning payments only to the extent that such costs are not covered by the sale of Cooper assets.

decommissioning costs attributable to any of NPPD's post-2004 use. As indicated, NPPD does not suggest, nor did the district court find, a contrary design.

NPPD argues, and the district court held, that Section 6 requires MEC to pay equally for decommissioning. Section 6 provides that "[NPPD] shall make monthly payments, determined on the same basis and in the same manner as [MEC]'s payments, for power and energy from [Cooper]." This merely begs the question "how are MEC's costs determined?"–which returns us to Sections 2(l) and 5. Regardless of whether decommissioning constitutes a Monthly Power Cost, both parties pay the same amount of Monthly Power Costs. And Section 5 specifically creates an imbalance regarding the payment of decommissioning costs in the event NPPD continues operations in 2004. As the specific governs the general, Krzycki, 496 N.W.2d at 922, Section 5 governs.

Finally, the district court put much stock in Section 5(b)'s list of possible sources of decommissioning funds. The PSC uses three similar formulations. First, NPPD shall invoice MEC for fifty percent of the previous month's costs:

> [I]n excess of funds created pursuant to the Bond Resolution, accumulated revenues from operation of [Cooper], credits received for fuel or fuel elements remaining as a part of [Cooper] at the time of decommissioning and proceeds and credits from the sale of equipment, machinery, supplies and land associated with [Cooper] or on account of the use of such items by [NPPD] for its other activities, and which are available for payment of said costs and expenses by [NPPD].

Next, MEC shall reimburse NPPD for decommissioning costs and expenses:

> [T]o the extent that funds, proceeds and credits created, accumulated or realized in connection with construction, operation and decommissioning of [Cooper] are unavailable or inadequate to pay said costs and expenses.

Finally, after each year, NPPD shall provide MEC with a statement detailing all costs:

> [I]n excess of funds and credits available for payment of said costs and expenses from funds created pursuant to the Bond Resolution, accumulated revenues from operation of [Cooper], credits received for fuel or fuel elements remaining as a part of [Cooper] at the time of decommissioning and proceeds and credits from the sale of equipment, machinery, supplies and land associated with [Cooper] or on account of the use of such items by [NPPD] for its other activities.

The district court ruled this language "clearly shows the parties intended that decommissioning costs would be accumulated from Monthly Power Costs." We disagree. This language certainly permits the parties to collect decommissioning funds during the contract period but in no sense requires pre-payment. Nor does this language dictate that such collections, if made, constitute Monthly Power Costs. Finally, as this language appears in Section 5(b), which assumes that NPPD has shut Cooper down in 2004, it does not address what would happen to such accumulated funds were NPPD to continue operations.

The PSC's four corners are unambiguous in not imposing on MEC an obligation to make current payments of estimated decommissioning costs.

## 2. Extrinsic Evidence

In reaching its ruling, the district court gave weight to two additional types of evidence. Because we hold that such was error, we specifically address them in turn.

First, the district court looked to sources detailing the modern nuclear industry. These suggest that in modern industry parlance, decommissioning constitutes an operating cost which "accrues" from the moment a plant comes on-line. The court relied on this evidence to give meaning to "Monthly Power Costs."

Nebraska law requires a contract to be read to give meaning to the intent of the parties at the time that the contract was made. Kast, 559 N.W.2d at 464. This rule avoids confusion resulting from changes in language and usage over time that might affect a contract's plain contemporary meaning. In employing the modern definition of decommissioning costs, the court apparently overlooked this principle and failed to give the contract its meaning at the time it was signed. This rule renders evidence regarding practices post-dating the contract's signing inapposite.

The district court also relied on cases discussing the principle of inter-generational equity, which holds that decommissioning costs are properly charged to current consumers rather than levied entirely on those buying electricity when decommissioning occurs. The merits of this principle notwithstanding, neither NPPD nor the district court explain why it should trump a binding contract providing otherwise. If MEC contracted its way out of decommissioning costs, the principle of inter-generational equity cannot not re-impose them. See generally Town of Boylston v. FERC, 21 F.3d 1130 (D.C. Cir. 1994).

## 3.     Course of Performance Evidence

In addition to the above evidence, the district court also considered the parties' conduct in performing under the PSC in determining whether the PSC was ambiguous. Nebraska law conflicts on the point, but suggests that a court may do so.

In Bishop's Buffet, Inc. v. Westroads, Inc., 274 N.W.2d 530 (Neb. 1979), the Nebraska Supreme Court rejected an attempt to use course of conduct evidence to call into question otherwise unambiguous contractual language. The court held that such evidence "aid[s] in the determination of the intent of the parties where that intent is not otherwise clearly expressed in the document." Id. at 533. Moreover, "[t]he practical construction put upon a lease contract cannot control the express, unambiguous

provisions of the instrument itself." Id.  See also Sky Harbor Air Serv. v. Airport Auth. of Omaha, 117 N.W.2d 383, 385 (Neb. 1962).

More recent Nebraska authority, however, apparently stands opposed.  In Stephens v. Radium Petroleum Co., 550 N.W.2d 39, 43 (Neb. 1996), the court expressly relied on course of performance evidence in finding an employment contract to be unambiguous.  It held that "[t]he interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence."  Id.  See also Professional Serv. Indus. v. J.P. Const., Inc., 491 N.W.2d 351, 354 (Neb. 1992) (holding "[t]he court may also consider the conduct of the parties in performing the contract to ascertain the parties' intent regarding their contract"); Strayer v. City of Omaha, 311 N.W.2d 510, 511 (Neb. 1981) (relying on course of performance evidence in finding contract to be unambiguous).

In these more recent cases, however, the course of performance evidence served only to bolster unambiguous language.  Nebraska has never permitted course of performance evidence to muddy otherwise unambiguous language.  That precise effort was rejected in Bishop's Buffet.  If faced again with this question, we believe the Nebraska Supreme Court would re-affirm Bishop's Buffet.  For the time being, however, the stated rule in Nebraska, albeit a weak one, remains that a court may consider course of performance evidence in determining ambiguity, at least under limited circumstances.

The district court relied on various instances of performance to bolster its reading of the contract.  It noted that while the parties amended the PSC five times, they never did so to address the underestimated decommissioning costs.  From this the district court concluded that the PSC already provided for decommissioning as a Monthly Power Cost.  The court also noted that MEC, without objection, paid Monthly Power Cost invoices which contained a line item for projected decommissioning costs.

Finally, the court cited a statement, approved by MEC that decommissioning would be paid by monthly statements billed to MEC. The district court concluded that MEC considered decommissioning a Monthly Power Cost.

We do not agree that the record permits these conclusions. The failure to amend the PSC at best evidences an ongoing dispute. Regarding the invoices, most other line items reference a PSC source, whereas the decommissioning item contains no such reference. And as regards its statement, MEC asserts that its conduct was colored by NPPD's representations that it would decommission Cooper in 2004. We find this evidence to be at best equivocal. Given the state of the law in Nebraska, we do not find it persuasive enough to overcome the plain, four-corners meaning of the PSC.

## 4.     The PSC as a Bar to Recovery

The PSC neither requires the pre-funding of estimated decommissioning costs, nor does it bar MEC's equitable claims to recover payments already made.[7]

First, MEC did not subject itself to liability for decommissioning costs by making pre-payments. Section 5 creates non-waivable conditions precedent to such liability. Its conditional language makes MEC's payment obligation contingent on NPPD's decision regarding continued operations. Estate of Stine v. Chambanco, Inc., 560 N.W.2d 424, 429 (Neb. 1997). "The Restatement (Second) of Contracts § 224 (1981) provides, 'A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" Lee

---

[7]Our resolution of the PSC's unambiguous meaning leaves unresolved the question whether MEC may recover payments already made in the event NPPD does continue operating Cooper after 2004. In the district court, MEC counterclaimed raising restitution and estoppel theories seeking recovery of those funds. Those claims are not before us and the parties must return to the district court to litigate them.

<u>Sapp Leasing, Inc. v. Catholic Archbishop of Omaha</u>, 540 N.W.2d 101, 105 (Neb. 1995). Moreover, "[t]he nonoccurrence of a condition precedent cannot be excused if occurrence of the condition was a material part of the agreed exchange." <u>Id.</u> Here, the parties bargained for an exchange of sole right to Cooper for immunity from decommissioning costs. Hence, NPPD's election of path is central to the exchange. By making payments, MEC did not waive its rights under Section 5.

Second, the complaint mechanism contained in Section 4(h) does not necessarily bar MEC's recovery.[8] Section 4(h) requires a party disputing an item on a monthly statement to give notice to the other party within sixty days. The district court found Section 4(h) outcome determinative because MEC paid Monthly Power Cost invoices for fifteen years without complaint.

We do not agree that Section 4(h) absolutely forecloses MEC's claim. It suggests the referenced "dispute" must be one over amount: "[s]uch notice shall identify the disputed bill [and] state the amount in dispute." MEC has not disputed the calculation of decommissioning costs, but only whether they should later be returned. Given the PSC's unambiguous meaning, MEC had no reason to object to the monthly invoices, as it believed them to be numerically correct, and that the amount would be refunded. MEC also raises reliance and estoppel arguments, suggesting that the only reason it paid the bills without objection was because NPPD represented that decommissioning would occur in 2004. Accordingly, we reverse the district court's

---

[8]PSC § 4(h) provides: "In the event of any dispute as to any portion of any monthly statement, [MEC] shall nevertheless pay the full amount of the disputed charges when due and shall, within sixty days from the date of the disputed bill, give written notice of the dispute to [NPPD]. Such notice shall identify the disputed bill, state the amount in dispute and set forth a full statement of the grounds upon which such dispute is based. No adjustment shall be considered or made for disputed charges unless notice is given as aforesaid."

-19-

ruling on this point and remand for further consideration in conjunction with its adjudication of MEC's counterclaims.

Finally, Section 5(a), which in the event NPPD continues to operate Cooper beyond 2004 terminates all of MEC's obligations and rights, including the right "to receive any refund of excess payments for power and energy theretofore purchased," does not preclude MEC from recovering monies already paid to NPPD. NPPD argues that this language cuts off MEC's right to a refund of accumulated, pre-funded decommissioning monies. However, "excess payments for power and energy" refers to Monthly Power Costs. As held above, pre-paid decommissioning funds are not Monthly Power Costs. Rather, such payments fall wholly outside the PSC.

\* \* \* \* \*

We hold, therefore, that considering all proper evidence, the PSC does not require MEC to make current, non-refundable payments of estimated decommissioning costs to NPPD, but makes MEC liable for Cooper's decommissioning only in the event that NPPD shuts Cooper down in 2004. Moreover, the PSC does not bar MEC's claims for restitution of amounts already paid.

**Pendent Award of Summary Judgment**

In the district court, MEC moved for partial summary judgment declaring that the PSC is unambiguous, that it imposes liability for decommissioning costs on MEC only in the event that NPPD ceases operating Cooper in 2004 and that the PSC does not bar MEC's recovery of the funds it has already paid into the joint sinking fund. Ordinarily, an order denying summary judgment may not be appealed until completion of the case below. However, in certain instances, we may exercise jurisdiction over "pendent" issues. "'[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent

-20-

claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal–that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well.'" Kincade v. City of Blue Springs, 64 F.3d 389, 394 (8th Cir. 1995) (quoting Moore v. City of Wynnewood, 57 F.3d 924, 930 (10th Cir. 1995)).  In reviewing the district court's grant of summary judgment to NPPD, we have resolved in MEC's favor every issue raised by its motion for partial summary judgment. Accordingly, we invoke our pendent jurisdiction and grant MEC's motion.

MEC also asks this court to reverse the district court's orders refusing to order discovery of NPPD's studies estimating Cooper's 2004 value.  Given our disposition of the foregoing issues, we remand this question to the district court for resolution as warranted in conjunction with its review of MEC's claims for recovery.

We reverse the district court, and remand the case for trial on MEC's counterclaims for recovery of the funds it has already paid into the decommissioning sinking fund, and all other outstanding claims.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.