United States Court of Appeals
For the Eighth Circuit
No. 17-1713

City of Kennett, Missouri

*Plaintiff - Appellant*

v.

Environmental Protection Agency; Karl Brooks, in his official capacity as
Regional Administrator of EPA Region 7

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau
_____

Submitted: January 11, 2018
Filed: April 9, 2018
_____

Before COLLOTON, BENTON, and ERICKSON, Circuit Judges.
_____

BENTON, Circuit Judge.

The City of Kennett, Missouri, sued the Environmental Protection Agency, challenging the EPA's approval of a total maximum daily load for Buffalo Ditch. The district court granted summary judgment for the EPA. The City appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms in part, vacates in part, and remands.

I.

The Clean Water Act requires, subject to EPA approval, states to establish "water quality standards." *See* **33 U.S.C. § 1313(a)**. Standards "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." **§ 1313(c)(2)(A)**. States must review standards at least once every three years and modify them "as appropriate." **§ 1313(c)(1)**.

To achieve water quality standards, the Act imposes "effluent limitations" under sections 1311(b)(1)(A) and (B). An "effluent limitation" is "any restriction . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into" certain waters. **§ 1362(11)**. A "point source," is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged"—*e.g.*, a drainpipe at a wastewater treatment plant. **§ 1362(14)**. But these effluent limitations may not be enough for all waters. States must "identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters." **§ 1313(d)(1)(A)**. These are called "impaired waters." *See, e.g.*, ***Missouri Soybean Ass'n v. EPA***, 289 F.3d 509, 511 (8th Cir. 2002) (referencing Missouri's list of "impaired waters"); ***Am. Farm Bureau Fed'n v. EPA***, 792 F.3d 281, 309 (3rd Cir. 2015) ("§ 1313(d) requires 'impaired waters' to be listed . . .").

For impaired waters, states shall establish, subject to EPA approval, "the total maximum daily load" (TMDL) for certain pollutants. **§ 1313(d)(1)(C), (d)(2)**. "Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety . . . ." **§ 1313(d)(1)(C)**. The TMDL calculates the impaired water's "loading capacity"—the greatest amount of a pollutant that can be introduced without violating water quality standards. **40 C.F.R. §§ 130.2(e)-(i), 130.7(c)**. It allocates loading capacity between point sources and

"nonpoint," "natural background sources." **§ 130.2(g)**-**(i)**. Allocations to point sources are "wasteload allocations" and "constitute a type of water quality-based effluent limitation." **§ 130.2(g)**.

TMDLs are implemented by a pollution permitting program. A "discharge of any pollutant" must comply with specified provisions of the Act. **33 U.S.C. § 1311(a)**. *See* **§ 1362(12)** (defining "discharge of a pollutant" as the "addition of any pollutant" into certain waters). One specified provision is section 1342, which establishes the National Pollution Discharge Elimination System (NPDES). **§ 1342**. Under NPDES, point-source operators obtain permits for discharge. *Id.* Permits must have limits on discharge necessary to achieve water quality standards. **40 C.F.R. § 122.44(d)(1)**. "When developing water quality-based effluent limits under [section 122.44(d)(1)] the permitting authority shall ensure that . . . [e]ffluent limits developed to protect [water quality criteria] are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA . . . ." **§ 122.44(d)(1)(vii)**, **(B)**. In other words, a permit for discharge into an impaired water must have limits on discharge that are consistent with the wasteload allocations in the TMDL.

The EPA can issue permits, but states can—and Missouri does—administer their own NPDES permit programs. **§ 1342(a)**-**(b)**. States must notify the EPA when they intend to issue a permit. **§ 1342(d)(1)**. If the EPA objects that the permit is "outside the guidelines and requirements" of the Act, "[n]o permit shall issue." **§ 1342(d)(2)**. *See* **40 C.F.R. §§ 123.44** ("EPA review of and objections to State permits"); **123.29** ("State permit programs shall provide that no permit shall be issued when the Regional Administrator has objected in writing under § 123.44."). Permits issued by states must be for "fixed terms not exceeding five years." **§ 1342(b)(1)(B)**.

## II.

Buffalo Ditch is a stream that runs southwest into Arkansas from the City. The City's Wastewater Treatment Plant is a point source of pollutants into it. Parts of Buffalo Ditch have been on Missouri's EPA-approved list of impaired waters since 1994, due to low levels of dissolved oxygen (DO), which benefits aquatic life. The water-quality criterion for DO in Missouri streams (with exceptions not relevant here) is 5 mg/L. Parts of Buffalo Ditch have historically not met this criterion (had *less than* 5 mg/L DO).

In 2001, with the EPA behind on establishing TMDLs, a court ordered it to approve a TMDL for Buffalo Ditch by the end of 2010. Before then, Buffalo Ditch had no TMDL. In 2009, Missouri published a draft TMDL, which identified the Treatment Plant as the primary point source. The City submitted comments and questions. Missouri responded, made adjustments, and submitted a final version to the EPA. The EPA approved it in 2010.

The final TMDL sets wasteload allocations for pollutants from the Treatment Plant. These wasteload allocations are more stringent than the limits in the City's NPDES permit. For example, the City's permit has limits of 65 mg/L of biochemical oxygen demand and 110 mg/L of total suspended solids (both on a weekly-average basis). The TMDL sets wasteload allocations for these two pollutants at 5 mg/L and 31 mg/L, respectively. The City's permit was to expire in 2015.[1]

---

[1]At oral argument in this court, the City said the 2010 permit had been "continued" pending a new one. The EPA's brief to this court says that after the district court's decision, Missouri proposed a permit, but the EPA objected on grounds that it "did not appear to include wasteload effluent limitations that are consistent with the assumptions and requirements of the TMDL." According to the EPA, this "interim objection" pauses its review until Missouri responds.

In its "Implementation Plan" for point sources, the TMDL says (emphasis added):

> This TMDL will be implemented partially through permit action. . . . Wasteload allocations developed for this TMDL will be used to derive new effluent limits . . . . However, *it is the intention of the [Missouri Department of Natural Resources] that prior to implementation of these wasteload allocations, either the department or the city will determine whether the dissolved oxygen criterion of 5 mg/L . . . is appropriate or if a site-specific dissolved oxygen criterion is required. . . .* If it is determined that the current water quality criterion for dissolved oxygen is appropriate, the wasteload allocations from the TMDL will be implemented. If it is determined not to be appropriate, and a new dissolved oxygen criterion is promulgated, then new wasteload allocations will be calculated and implemented.

Despite this intention, the DO criterion and the TMDL have apparently not changed.

The City sued, alleging three counts: (1) the EPA exceeded its authority in approving the TMDL; (2) the EPA acted arbitrarily and capriciously; (3) the EPA failed to provide the required notice and comment.[2] The City asked the district court to declare the TMDL unlawful, vacate it, remand it to the EPA, and enjoin its enforcement.

The district court ordered the parties to file cross-motions for summary judgment, saying that "this case should be able to be resolved pursuant to dispositive motions based on the administrative record that formed the basis of the administrative

_____

[2]In a fourth count, the City asked for relief pending review under 5 U.S.C. § 705. The district court did not address this request. Neither party raised the issue on appeal. This count is waived. *See **Jenkins v. Winter**,* 540 F.3d 742, 751 (8th Cir. 2008) ("Claims not raised in an opening brief are deemed waived."). The district court did not err in granting summary judgment on count four.

-5-

decision of EPA being challenged." In support of its cross-motion, the City argued for summary judgment on counts one and two, asserting that full implementation of the TMDL would not bring Buffalo Ditch into compliance with the DO criterion because of nonpoint pollution.

In support of its cross-motion, the EPA argued that (1) the City waived counts one and two by not raising its arguments in the administrative process; (2) the City waived count three by failing to argue for summary judgment on it; (3) the City lacked standing because a favorable decision would not redress its injury; and (4) it was entitled to summary judgment on the merits.

The district court granted summary judgment to the EPA. The court ruled that standing and ripeness were lacking, because the City will suffer harm only if and when the TMDL is implemented. The court did not address the EPA's waiver or merits arguments.

This court reviews de novo standing and ripeness determinations, and grants of summary judgment. *Heglund v. Aitkin County*, 871 F.3d 572, 577 (8th Cir. 2017) (standing); *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 796 (8th Cir. 2016) (ripeness); *First Dakota Nat'l Bank v. Eco Energy*, 881 F.3d 615, 617 (8th Cir. 2018) (summary judgment). "This court may affirm summary judgment on any grounds supported by the record." *Food Market Merch., Inc. v. Scottsdale Indem. Co.*, 857 F.3d 783, 786 (8th Cir. 2017) (internal quotation marks omitted).

### III.

The EPA argues the City waived count three—inadequate notice and comment. In its memorandum supporting summary judgment, the City did not mention or argue for summary judgment on count three. Nor did its reply and surreply memos respond to the EPA's arguments for summary judgment on that count. "[F]ailure to oppose

a basis for summary judgment constitutes waiver of that argument." ***Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trs.***, 558 F.3d 731, 735 (8th Cir. 2009). The City waived count three. The district court did not err in granting the EPA (and denying the City) summary judgment on count three.

IV.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements . . . The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." ***Spokeo, Inc. v. Robins***, 136 S. Ct. 1540, 1547 (2016), *quoting* ***Lujan v. Defenders of Wildlife***, 504 U.S. 555, 560-61 (1992). "[S]tanding is to be determined as of the commencement of the suit." ***Nat'l Parks Conservation Ass'n v. EPA***, 759 F.3d 969, 973 (8th Cir. 2014), *quoting* ***Lujan***, 504 U.S. at 570 n.5. The party seeking judicial review has the burden of persuasion and, at the summary judgment stage, must support each element by "set[ting] forth by affidavit or other evidence specific facts." ***Iowa League of Cities v. EPA***, 711 F.3d 844, 870 (8th Cir. 2013), *quoting* ***Lujan***, 504 U.S. at 561.

The issue is whether the City has standing to bring counts one and two. The City argues that (1) it will incur compliance costs when the TMDL is implemented; (2) these costs are fairly traceable to the EPA's approval of the TMDL; and (3) they are likely to be redressed by a favorable decision. The second element—causation—is met and not in dispute. *See **id.*** (costs of complying with limitations in EPA letters to be implemented in NPDES permits are fairly traceable to the EPA's promulgation of the letters).

A.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual

or imminent, not conjectural or hypothetical.'" ***Spokeo***, 136 S. Ct. at 1548, *quoting* ***Lujan***, 504 U.S. at 560. The district court ruled that the City's injury, relating to the TMDL's future implementation, is not imminent. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." ***Clapper v. Amnesty Int'l USA***, 568 U.S. 398, 409 (2013) (emphasis in original), *quoting* ***Lujan***, 504 U.S. at 565 n.2. "In future injury cases, the plaintiff must demonstrate that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" ***In re SuperValu, Inc.***, 870 F.3d 763, 769 (8th Cir. 2017) (some internal quotation marks omitted), *quoting* ***Susan B. Anthony List v. Driehaus***, 134 S. Ct. 2334, 2341 (2014). "*[P]ossible* future injury" is insufficient. ***Clapper***, 568 U.S. at 409 (emphasis in original).

The *Iowa League of Cities* case is controlling. There, the League challenged EPA letters that it alleged imposed new limitations on the point-source discharge of its member cities. ***Iowa League***, 711 F.3d at 854-60. Federal law required implementation of these limitations by NPDES permits. ***Id.*** at 857, 59. This court held that the League had associational standing, which requires that one of its members has standing:

> At least some members are currently operating under permits that allow them to utilize [certain methods of discharge] inconsistent with the EPA letters, which they must imminently rectify. . . . Moving into compliance will be costly. The league has therefore articulated an injury in fact.

***Id.*** at 870.

At the commencement of this suit, the City was operating under a permit that allowed discharge inconsistent with the TMDL. The permit was set to expire in 13 months. Any new permit must contain more stringent limits on discharge, consistent with the TMDL's wasteload allocations for the Treatment Plant. Moving into

-8-

compliance will be costly. In its brief, the EPA "does not question that the City may eventually have to expend funds in connection with the TMDL," nor "contest that the expenditure of money to comply with [] final permit conditions established to implement a TMDL generally is sufficient injury to support standing to challenge the TMDL." The City has established injury in fact. *See Am. Farm Bureau*, 792 F.3d at 293 (standing to challenge TMDL where "even if the TMDL does not cause injury by itself, it will give way to requirements," which will "cause compliance costs for [the plaintiff], a classic injury-in-fact").

The district court relied on *City of Dover v. EPA*, 36 F. Supp. 3d 103, 106-14 (D.D.C. 2014). There, a group of cities challenged the EPA's approval of a list of impaired waters. The cities claimed that including certain waters on the list would require permits with more stringent limits. *Id.* at 111. The court found no injury in fact, "because it is uncertain whether the permits they are issued in the future will contain those limits . . . ." *Id.* at 112. Including the waters did not "guarantee" more stringent permits, the court said, because it would affect permits only "indirectly" through a TMDL, due to "uncertainty surrounding the as-yet-unpromulgated TMDL." *Id.* at 114. To the contrary, the EPA here has approved a TMDL that requires more stringent limits for the City. The City is challenging that TMDL. But even to the extent *City of Dover* is inconsistent, it is not persuasive authority for a different outcome here.

The City's injury is certainly impending despite Missouri's "intention," expressed in the TMDL, to review the DO criterion before implementing the TMDL. Once approved by the EPA, the TMDL's wasteload allocations are binding on future permits unless the EPA approves a replacement TMDL. To say that the permit will comply with the TMDL is not "conjectural." *Cf. Clapper*, 568 U.S. at 412 ("[B]ecause § 1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural." (emphasis in original)). At the commencement of this suit, about four years after the EPA approved the TMDL, the DO criterion and the TMDL had not

changed. The possibility that Missouri, with EPA's approval, could promulgate a new DO criterion and change the TMDL before implementation does not prohibit the City from challenging it.

B.

For redressability, it must be "'likely,' as opposed to merely 'speculative,' that [the City's] injury will be redressed by a favorable decision." ***Balogh v. Lombardi***, 816 F.3d 536, 543 (8th Cir. 2016), *quoting **Lujan***, 504 U.S. at 561. Conceding that "[t]he problem in this case is not injury-in-fact," the EPA argues that the City has not established redressability. The EPA emphasizes the City's argument that the TMDL is insufficient to bring about compliance with the DO criterion. According to the EPA, "if [the City] prevailed on [its] claims and EPA addressed them on remand in the manner advocated by the City, it would cost the City more money."

But the City does not seek a more stringent TMDL. It seeks to vacate the EPA's approval of the current one and remand it to the EPA. On remand, the EPA and Missouri might address the TMDL's deficiencies by making it more stringent. This would likely result in the same or higher compliance costs for the City. But this is not the only possibility. The City hopes that the EPA and Missouri will address the DO criterion, which the City sees as the fundamental problem. According to the City, 5 mg/L DO is unattainable at Buffalo Ditch "regardless of any action or inaction on the part of the City" and "even with drastic reductions to non-point source contributions . . . ." In the TMDL, after all, Missouri questioned whether the DO criterion was appropriate for Buffalo Ditch. A lower DO criterion would likely result in lower compliance costs for the City.

It is not clear which possibility is more likely. But if the City does not prevent its injury, it will at least delay it. The delay would last at least until the EPA approves a new TMDL, which may exceed the duration of the City's permit(s). Redressability is met where a favorable decision "avoids, or at least delays," a regulatory burden.

-10-

***Nat'l Parks Conservation***, 759 F.3d at 975.  The City has established redressability and standing.

V.

"Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." ***Nat'l Park Hospitality Ass'n v. Dep't of Interior***, 538 U.S. 803, 808 (2003).  "Both of these factors are weighed on a sliding scale, but each must be satisfied to at least a minimal degree." ***Iowa League***, 711 F.3d at 867 (internal quotation marks omitted).  "'[R]ipeness is peculiarly a question of timing,' and 'it is the situation now rather than the situation at the time of the [decision under review] that must govern.'" ***Anderson v. Green***, 513 U.S. 557, 559 (1995) (per curiam) (alteration in original), *quoting* ***Reg'l Rail Reorganization Act Cases***, 419 U.S. 102, 140 (1974).  *Accord., e.g.*, ***Iowa League***, 711 F.3d at 867; ***Pub. Water Supply Dist. No. 8 v. City of Kearney***, 401 F.3d 930, 932 (8th Cir. 2005).  *But see* ***Sierra Club v. U.S. Army Corps of Eng'rs***, 446 F.3d 808, 814 (8th Cir. 2006) ("Jurisdictional issues such as standing and ripeness are determined at the time the lawsuit was filed . . . .").  The EPA argues that neither factor is satisfied.

"Fitness rests primarily on whether a case would benefit from further factual development . . . ." ***Iowa League***, 711 F.3d at 867 (internal quotations omitted).  The key issue here is whether the EPA lawfully approved the TMDL.  This depends primarily on the administrative record supporting the EPA's decision.  The EPA proposes to delay review until the TMDL is actually implemented. But even assuming the means of implementation are relevant, there is little dispute what they are.  The upcoming permit must implement the TMDL by imposing limits on discharge consistent with the TMDL's wasteload allocations for the City.  This is not a situation where "further factual development regarding the agency's application of the [TMDL] would aid our decision." *See* ***id.***, *citing* ***Nat'l Park Hospitality***, 538 U.S. at 812.

"The hardship factor looks to the harm parties would suffer, both financially and as a result of uncertainty-induced behavior modification in the absence of judicial review." *Id.* In *Iowa League of Cities*, this court explained that delaying review of certainly impending regulatory burdens can cause harm:

> Although the EPA portrays the harm as lurking, if at all, on the distant horizon, the threatened harm is more immediate, and it is certainly not speculative. League members must either immediately alter their behavior or play an expensive game of Russian roulette with taxpayer money, investing significant resources in designing and utilizing processes that—if these letters are in effect new legislative rules—were viable before the publication of the letters but will be rejected when the letters are applied as written. . . . Postponing our review until the EPA has denied a permit application in accord with the letters renders a hardship on municipal water authorities, who already would have invested irretrievable funds into their applications.

*Id.* at 868 (internal citation omitted).

This applies here, where the City must make planning decisions based on the TMDL's wasteload allocations. *See* **Am. Farm Bureau**, 792 F.3d at 293-94 ("Although the TMDL has yet to be incorporated into a state's continuing planning process and enforced against any individual plaintiff, members of the trade associations will have reason to limit their discharge of pollutants in anticipation of the TMDL's implementation. . . . If there is something wrong with the TMDL, it is better to know now than later."). *Cf.* **Reg'l Rail Cases**, 419 U.S. at 143 ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."). *But cf.* **City of Dover**, 36 F. Supp. 3d at 119-20 (challenge to the EPA's approval of list of impaired waters not ripe because permits had not issued).

-12-

The EPA emphasizes Missouri's "intention" to review the DO criterion before implementation of the TMDL. The EPA proposes delaying review, because implementation is a "contingent future event[] that may not occur as anticipated, or indeed may not occur at all." *See Kennedy v. Ferguson*, 679 F.3d 998, 1001 (8th Cir. 2012). But the expiration date of the City's permit has passed, Missouri and the EPA are developing a new permit, and the DO criterion has not changed. The chance of a change in the TMDL before implementation does not warrant delay. *Cf. City of Arcadia v. EPA*, 265 F. Supp. 2d 1142, 1156-59 (N.D. Cal. 2003) (challenge to TMDLs not ripe due to evidence that the permitting authority would "revisit the TMDLs" and could "submit new TMDLs to EPA for review and potential approval *well before the compliance dates* in the [] TMDLs" (emphasis added)), *citing Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998) (challenge to EPA action not ripe, partly because "the possibility that further consideration will actually occur before the Plan is implemented is not theoretical, but real"). This case is ripe. The district court erred in granting the EPA summary judgment on counts one and two.

VI.

The EPA argues that the City waived claims one and two by not raising its arguments in the administrative process. Because it would be beneficial, this court remands this argument to the district court for consideration in the first instance and, if necessary, the merits of counts one and two. *See Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 851 (8th Cir. 2014) ("When it would be beneficial for the district court to consider an alternative argument in the first instance, we may remand the matter to the district court."); *Lafarge N. Am., Inc. v. Discovery Grp., LLC*, 574 F.3d 973, 986 n.9 (8th Cir. 2009) ("Because we believe it would be beneficial for the district court to address these issues in the first instance, we decline to affirm on these alternative theories.").

\* \* \* \* \* \* \*

The judgment is affirmed as to counts three and four, and otherwise vacated and remanded for proceedings consistent with this opinion.

_____